Dureee, Judge,
delivered the opinion of the court:*
Plaintiff claims additional compensation for increased costs under the “changed conditions” provision of a contract with defendant for construction of a railroad bridge in Oregon. This construction was part of a Federal dam project which required the relocation of highway and railroad facilities in the State of Oregon. The entire project also included construction, at about the same time, of a highway bridge parallel to and immediately upstream from plaintiff’s railroad bridge project on the Deschutes River. The highway bridge was constructed by another company, Young & Smith, under an earlier contract with the State of Oregon, which had the prime contract with defendant for construction of this highway bridge.
Prior to plaintiff’s bid on the railroad bridge, Young & Smith had been awarded the sub-contract for the highway bridge by the State of Oregon. It had planned a cofferdam across part of the river above the highway bridge to facilitate and protect its construction, and had quarried the rock therefor. Upon learning that plaintiff was the low bidder *42 for the railroad bridge immediately below,[1] Young & Smith proposed sharing the cost of its cofferdam with plaintiff, together with other cooperative proposals such as sharing equipment. Plaintiff replied that he could make no commitment until he knew that he was to be awarded his contract. During the nest two weeks, the parties were unable to arrange a meeting, and Young & Smith proceeded to build its cofferdam.
Prior to construction of the Young & Smith cofferdam above the highway bridge upstream, the normal width of the river at this location was 200 to 250 feet. The distance between the two railroad bridge abutments on the east and west river banks was about 500 feet, and the main channel, before construction of the Young & Smith cofferdam upstream would have run approximately under the middle area of the proposed railroad bridge.[2]
Plaintiff’s railroad bridge project downstream and Young & Smith’s highway bridge project upstream were to be constructed parallel in an east-west direction, and less than 68 feet apart. Plaintiff’s plans for the railroad bridge called for bridge support by a masonry abutment (Number 2) on the east bank of the river, another abutment (Number 1) on the west bank of the river, and intermediate piers in the river channel numbered 1 to 5 from west to east.
The plans for Young & Smith’s highway bridge called for supports called “bents,” numbered 1 to 9 from west to east. Bents 1 and 9 had the same purpose as Abutments 1 and 2 of the railroad bridge, and Bents 2 to 8 the same purpose as Piers 1 to 5 of the railroad bridge. The highway bridge upstream was to extend longitudinally farther both west and east than the railroad bridge, with its Bent 1 lying slightly west of Abutment 1 of the railroad bridge, and Bent 9 lying slightly east of Abutment 2. The relative location of the proposed highway and railroad bridges is depicted in the following diagram:

*43
Relative Location of Relocated High/way and RaMroad Bridges

TOTJNG & SMITH’S CONSTRUCTION OE A COEFERDAM
According to the contract drawings of the Corps of Engineers, it could be reasonably estimated that during the period of construction under plaintiff’s contract, about 1 y2 feet of water would be touching Abutment 2 of the railroad bridge on the east side of the river, and about 2% feet of water would be around the furthermost pier (Number 5) on the east side. This would not create a major water problem. From his investigation of the site and defendant’s water-flow charts before and after bidding on the railroad bridge con *44 tract, plaintiff was justified in concluding that the amount of water around Abutment 2 and Pier 5 at the east side of the river would not he substantial during the construction period, and that elaborate cofferdamming would not be necessary.
Plaintiff received notice from defendant to proceed with his contract for the railroad bridge on July 6, 1954. By this time Young & Smith had completed construction of its cofferdam above the highway bridge upstream. This cofferdam was a solid and continuous rock and sand-fill barrier extending from Bent 1 of the highway bridge on the east bank of the river west across two-thirds of the channel to Bent 1. The two bridge sites are located at the bottom of swift rapids and the Young & Smith cofferdam diverted the entire flow of the river from the wide central main channel to a new narrow channel on the east side. As a result, the entire river then passed over the “normally high and dry” location of plaintiff’s east Abutment 2 and Pier 5 for the railroad bridge with considerable added depth, speed and force. A better method of dewatering by Young & Smith under accepted engineering practice would have been construction of a series of individual cofferdams at each of the nine highway bridge “bents” or piers connected by temporary bridging for access. This established method would not have diverted the central main channel to the east one-third of the river bed, and this was the method that plaintiff planned to use when he had also bid on the highway bridge.
Because of this unexpected river diversion confronting plaintiff on the day he was authorized to start construction, he delayed his operations on the east side of the river, and proceeded with construction only on the west side at Abutment 1, Piers 1 and 2, which was now relatively dry. At various times shortly after receiving notice to proceed, plaintiff asserted orally and in writing to> defendant’s representatives that these changed conditions at the site had resulted from the Young & Smith cofferdam a short distance upstream. Plaintiff asserted that Abutment 2 could only be constructed after he first built a cofferdam there at great *45 increase in cost. He stated that the combination of this cofferdam with that of Young & Smith’s immediately upstream would result in virtually damming the entire river, thus causing extreme danger to the cofferdam upstream, to life and to property.
Plaintiff accordingly requested the contracting officer orally and in writing to issue a stop order on construction of Abutment 2, the site of which was now under what plaintiff described as “a great howling mass of water.” He also requested an extension of the completion date thereon until Young & Smith had completed its work upstream to the stage where it could pull its cofferdam back west more to the former center of the channel, and thus eliminate the flooded condition on the east side of the river at Abutment 2 and Pier 5. He asserted that these circumstances were changed conditions under the contract throughout a series of conferences and correspondence extending from early in August through the middle of September, 1954.
To these allegations of changed conditions by plaintiff and to his request for a stop order on Abutment 2, the contracting officer replied that there was no evidence of changed conditions within the meaning of the contract or as a basis for issuance of a stop order or time extension for completion of the abutments, and refused to issue the stop order on Abutment 2.
Upon appeal by plaintiff from the contracting officer’s findings and decision pursuant to the disputes provision of the contract, the Board of Contract Appeals decided:
Undoubtedly, the appellant when he submitted his bid did so without giving any consideration to a possible diversion of the main stream from its channel to the location of the east abutment. This diversion was not mentioned in the contract documents. When he encountered this condition on the job he felt it to be a changed condition under the terms of the contract. It was not a subsurface or latent physical condition at the site differing from those indicated in the contract. It was instead a strictly man-made condition caused by the operations of another independent contractor, and dependent upon his discretion and judgment. Appellant’s contract included the information that other contractors *46 would be working on the site and required cooperation between them. There was nothing unusual under these circumstances with respect to river diversion. It was to be expected. In order to accomplish the desired construction on both contracts, either diversion or some other method of river control was mandatory. The method was properly left to the successful bidders. The diversion as accomplished was not an unknown physical condition at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. (Fdg. 29(d)).
On the basis of the administrative record before the Board, we conclude that this portion of the Board’s decision is erroneous as a matter of law and is not supported by substantial evidence.
Both the highway and the railroad bridge contract enjoined mutual cooperation. Furthermore, such cooperation between contractors is to be expected on a project of this kind. However, it is found from the great weight of the testimony, that there was very little or nothing that plaintiff could do by way of cooperating with the other contractor in his construction of the upstream cofferdam. In the first place, when submitting his bid, plaintiff could not cooperate with Young & Smith since the latter was a rival for that contract, as were the two for the highway bridge Contract. Secondly, when Young & Smith’s general superintendent, Mr. Thatcher, telephoned plaintiff, after the railroad bids were opened, Mr. Thatcher testified that his plans had already been made for building a solid barrier from the west bank to Bent 6; that this was what he was going to do in any event. Moreover, at the time in question, Mr. Thatcher himself did not anticipate that water conditions at Bent 6 would make it necessary to extend his cofferdam further east to Bent 7. Third, the primary purpose of Mr. Thatcher’s call was not to obtain plaintiff’s cooperation but to suggest that plaintiff share in the cofferdam’s cost. While the record is clear that plaintiff did not respond to this suggestion with alacrity or enthusiasm, the record is equally clear that plaintiff could scarcely expect that Mr. Thatcher would dam the river even further east to the Bent 7 location, causing it to *47 flow over the Abutment 2 location with considerable depth, velocity and force. Yet this was precisely the situation confronting plaintiff when on July 6 he received notice to proceed on the contract. Thereafter, plaintiff tried to secure cooperation by asking the contracting officer to direct the State Highway Department or its subcontractor, Young & Smith, to cut ba’ck its cofferdam east to the center of the river, so as to lessen the effect of the greatly increased force and depth of the flow of the diverted river at Abutment 2 and Pier 2 of the railroad bridge directly below.
Article 3(b) of defendant’s contract with the State for the highway bridge required:
b. The Government may award other contracts for additional or other work in connection with the same project or in the same vicinity. The State shall conduct operations so as to cooperate fully with any such work being performed by the Government and/or Government contractors and shall carefully fit its own work to that provided under other contracts as directed by the Contracting Officer. The State shall not commit or permit any act which may interfere with the performance of any such work by the Government and/or any Government contractor. (See Findings — Appendix D) [Emphasis supplied.]
Not only did the contracting officer refuse to invoke this clear authority to direct the State to cooperate in the performance of its contract with defendant, he responded to plaintiff’s request as follows:
It is the position of this office that it is incumbent upon you to meet fully the requirements of your contract, to cooperate and coordinate your efforts with the State contractor for your mutual benefit, and to adhere strictly to the completion schedules set forth in your contract, or as they may be modified.
In this connection you are further advised that the State’s operations are not under any direction or authority of this office, nor is there any privity of contract existing between this office and the State contractor.
In short, it must be considered that any direct damages inflicted upon your work by the activity of the State contractor would be in the nature of a tortious action and beyond any contractual rights controlled by the Government. [Emphasis supplied.]
*48 Plaintiff appealed from this decision to the Board of Contract Appeals on November 26th. Coincidentally, on the same day, the contracting officer agreed to extend the time for plaintiff to complete the abutments by fifty days. This was done by a modification of the contract which recited that it had been determined that “delay in the performance of the contract was due to causes beyond (plaintiff’s) control and without (his) fault or negligence, namely, acts of another contractor (The State of Oregon) in the performance of a contract with the Government.” [Emphasis supplied.]
The final decision of the Board of Contract Appeals, in referring to cooperation between the two contractors, concluded:
Both contracts enjoined mutual cooperation. Such cooperation is to be expected on any project and of necessity is an inherent ingredient of the construction industry. From the very outset of this project it was not achieved between two contractors, each of whom has bid on both contracts and were fully conversant with its extreme importance. The contracting officer is1 not designated by the contract as the arbiter and quite properly refused to take sides in the matter. When it was made evident to him that the scheduled completion of the abutments could not be timely accomplished because of interference he granted an extension.
We conclude that this portion of the Board’s decision is likewise legally erroneous and unsupported by substantial evidence. It completely disregarded the rights of plaintiff to cooperation from the contractor upstream whose acts were the cause of plaintiff’s difficulties (as found by the contracting officer). These rights inured through the right of the Government to require cooperation from this subcontractor through the Government contract with the prime contractor, the State of Oregon. There is no evidence that defendant ever attempted to secure this cooperation, other than arranging for one unsuccessful conference with Young & Smith who refused to make any changes “because nobody offered to pay for it.”
While the Government placed great stress in its contracts with plaintiff and the State of Oregon on the necessity for mutual cooperation, it completely disregarded the rights of *49 plaintiff to cooperation from the contractor upstream. For tlie Board to say, under circumstances where the contracting officer himself found the acts of the contractor upstream to be the cause of plaintiff’s delay, that “the contracting officer is not designated by the contract as the arbiter and quite properly refused to take sides in the matter,” is a complete and unwarranted disavowal of all responsibility on the part of the Government to direct or require cooperation from anyone (except plaintiff). Such a conclusion by the Board is erroneous as a matter of law and not supported by the substantial evidence in the administrative record.
One of the principal contentions of defendant is that a manmade condition which could have been avoided by cooperation of the two contractors involved is not a changed condition within the purview of the Changed Conditions Clause of the contract. The condition which confronted plaintiff on July 6, 1954, when it was authorized to proceed with its contract, was diversion of the river flow by the upstream contractor. This diversion, as the contracting officer found, “was due to causes beyond (plaintiff’s) control and without (his) fault or negligence, namely, acts of another contractor in the performance of a contract with the Government.” These were acts of the upstream contractor which plaintiff could not reasonably have expected or foreseen, and they were acts which created a changed condition in the flow of the river which existed when plaintiff was directed to proceed with his contract. The decision of the Board of Contract Appeals fails to point out where plaintiff failed to cooperate in avoiding this changed condition, “man made” by the other contractor before plaintiff even had authority from defendant to proceed with construction. This changed condition was the direct cause of plaintiff’s subsequent difficulty and delay in construction, and was clearly within the purview of the Changed Conditions Clause of the contract. The modification of plaintiff1’s contract, and extension of time subsequently adopted by the Government as a result of this changed condition were accepted under protest by plaintiff. Plaintiff was accordingly entitled to increased compensation under Article 4 of the contract, but this claim was refused by the contracting officer. The Board’s concurring decision *50 in this regard is likewise legally erroneous and unsupported by substantial evidence in the administrative record.
Defendant has also contended that the use of the administrative record by this court is limited to proof of what was before the Board of Contract Appeals to support or not to support its decision. Defendant submits that “a reading of the Commissioner’s report herein, one adverse to the defendant on the liability issue and diametrically opposed to the Board’s decision, will show that it has treated evidence before the Board and prior testimony in a District Court proceeding as though they were direct evidence in a trial de novo in this court, deciding questions of credibility, irreconcilable conflicts in plaintiff’s utterances, and the weight of the evidence in plaintiff’s favor.”
By agreement of the parties before the trial, the evidence in this case is entirely documentary and consists primarily of the administrative record before the Board. The remaining evidence consists of the record of certain proceedings before the United States District Court, District of Oregon, in an action brought against plaintiff by another contractor known as Young & Smith Construction Co. Also by agreement of the parties, the evidence in this case, including the administrative record before the Board, was offered and received without limitation of any kind.
Plaintiff’s petition fails to allege that the Board’s decision is not supported by substantial evidence, but does assert that the decision was arbitrary and capricious. However, the Disputes Article here involved was approved for use before enactment of the Wunderlich Act, and does not contain the “substantial evidence” phraseology thereafter incorporated into the law and most dispute provisions. Plaintiff’s defect in pleading is one of form and not of substance.
The Trial Commissioner’s conclusion as to changed conditions (Finding 30(a)) states:
On the basis of the administrative record before the Board, it is found as a fact, first that the Board’s decision is not supported by substantial evidence.
Throughout the findings, the Trial Commissioner refers to the “great weight of evidence before the Board” in concluding that its decision was not supported by substantial *51 evidence. Because of the “trial de novo” issue raised by defendant, we have analyzed the evidence in the administrative record below in detail upon which the Commissioner placed sole reliance in his opinion. We find that the Trial Commissioner correctly concluded, solely upon the administrative record, that the decision of the Board of Contract Appeals is not supported by substantial evidence. We further find that the Commissioner did not consider the evidentiary record as though produced at an actual trial de novo before him even though the parties may have stipulated that the record below be submitted to him without limitation.
Defendant urges that the criterion set forth in Bateson Co. v. United States, 149 Ct. Cl. 514, 518 (1960) that substantial evidence means “such evidence as might convince a reasonable man, to support the conclusion reached by the agency officials,” is fully met in this case. Even were we to assume that there is some evidence which, standing alone, might convince a reasonable man to support the Board’s conclusion, this, in and of itself would not be sufficient here. As we stated, in Williams v. United States, 130 Ct. Cl. 435, 441, 127 F. Supp. 617, 619, cert. denied, 349 U.S. 938 (1955):
The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.
We find on the basis of the administrative record (see United States v. Bianchi and Co., 373 U.S. 709, 717 (1963)), that plaintiff is entitled to recover on its claim but that the amount of recovery sought should be reduced as follows:
1. Considering the water conditions prevailing in the Abutment 2 area on September 11, it is found that plaintiff could and should have adopted a less expensive and more feasible method for dewatering than the construction of a rock jetty and cofferdam at the job site. The preferable method would have involved construction at the abutment area of a rock-fill island connected to the bank by a temporary bridge. Accordingly, the amount of any equitable adjustment for increased costs to plaintiff for increased *52 eofferdamming should be based on an island-type cofferdam rather than on the solid type installed by plaintiff.
2. It is found that plaintiff benefited from the Young & Smith cofferdam by being able to construct various substructures at the west side of the bridge, under dry conditions, particularly Pier 3. For that reason, any equitable adjustment for increased costs to plaintiff should be reduced by the amount of such monetary benefits.
3. Prior to the Board hearing, plaintiff filed an amended claim with the contracting officer for the additional sum of $17,324.00 which represented the amount claimed against him by Young & Smith for damages to its highway bridge cofferdam.
The Board declined to consider this claim, and plaintiff has asserted it separately in his petition here. This is the only item outside of the administrative record. Plaintiff introduced no proof here on this claim. Defendant introduced pleadings and two depositions in an action brought by Young & Smith against Lee Hoffman (the instant plaintiff) in the United States District Court of Oregon. This action was dismissed by order of the District Court in April of 1958, and the parties stipulated that their respective claims in that case “were washed out — against one another.” No payments were made to Young & Smith by plaintiff. Accordingly, plaintiff is not entitled to recover in any amount on this claim for $17,324.00.
Finally, we conclude, upon the record as stipulated by the parties, that plaintiff is entitled to recover an equitable adjustment for increased costs from Changed Conditions as prescribed in his contract with the Government, with the amount of recovery to be determined pursuant to Buie No. 47(c) (2). Judgment is entered accordingly.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Herbert N. Maletz, the briefs and argument of counsel, makes findings of fact as follows:
1. (a) The plaintiff is an individual engaged in the general contracting business under the name of Lee Hoffman, with his office and place of business in Beaverton, Oregon.
*53 (b) Plaintiff’s major claim is for recovery of increased costs under Article 4 of a contract with the defendant[3] for the construction of a railroad bridge across the Deschutes Kiver in Oregon. The claim is based on the contention that he encountered a changed condition while performing that contract. This contention was decided adversely to the plaintiff by the contracting officer and the Corps of Engineers Claims and Appeals Board (hereafter referred to as “the Board”) in Decision No. 1188.
(c) By agreement of the parties, the evidence in this case is entirely documentary and consists primarily of the administrative record before the Board. The remaining evidence consists of the record of certain proceedings before the United States District Court, District of Oregon, in an action brought against the plaintiff by another contractor, known as Young & Smith Construction Co. Also by agreement of the parties, the evidence in this case, including the administrative record before the Board, was offered and received without limitation of any kind.
(d) Upon stipulation of the parties, and with the approval of the Commissioner, the case here is presently limited to the issues of law and fact relating to the right of the plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
RELOCATION OE DESCHUTES RIVER HIGHWAY AND RAILROAD BRIDGES NECESSITATED BY DALLES DAM PROTECT
2. Construction by the Corps of Engineers, U.S. Army, of a power and navigation project known as The Dalles Dam, *54 Columbia Eiver, Washingtou-Oregon, required the relocation of various highway and railroad facilities in the State of Oregon. These relocations included a highway and a railroad bridge both crossing the Deschutes Eiver [4] near its mouth at a point about 14 miles east of The Dalles, Oregon. The highway bridge, carrying the traffic on Eoute 30, lay parallel to and immediately upstream from the railroad bridge, carrying traffic for the main line of the Union Pacific Eailroad Company.
CONTRACT BETWEEN CORES OE ENGINEERS AND STATE OE OREGON
3. (a) On January 6, 1953, Contract No. DA-35-026Eng-20358 was entered into between the defendant, acting through the District Engineer, Corps of Engineers, U.S. Army, Portland, Oregon District, and the State of Oregon, acting through the State Highway Commission. Under this contract, the State agreed to perform the relocation and construction of certain facilities of Eoute 30 necessitated by The Dalles Dam project, for which defendant agreed to pay to the State, $1,170,250. The relocations included the design and construction of a new highway bridge across the Deschutes Eiver near its mouth, but south of, and thus further upstream from the then existing bridge.
(b) Pertinent provisions of this contract are set forth in Appendix A of this Eeport.
CONTRACT BETWEEN STATE OE OREGON AND YOUNG & SMITH FOR CONSTRUCTION OE HIGHWAY BRIDGE
4. (a) On April 19, 1954, the State of Oregon, acting through the State Highway Commission, awarded the contract for construction of the new Deschutes Eiver highway bridge (and of two other bridges not pertinent here) to the low bidder, Young & Smith Construction Co. (hereafter referred to as “Young & Smith”), a partnership, with its place of business in Portland, Oregon. The total amount of the contract was $245,900, of which $196,750 was for construction of the Deschutes Eiver bridge.
*55 (b) The plaintiff was the second low bidder on this contract and was familiar with its requirements.
(c) The contract provided that all work on the project was to be governed by specifications prescribed by the State. It also provided that performance of work was to be started within 20 days after the contractor was notified of the award and that the contract was to be completed on or before May 31, 1955.
(d) The substructure of the Deschutes Eiver highway bridge consisted of nine bents[5] numbered consecutively 1 through 9. Bent 1 was the end bent on the west and bent 9 the end bent on the east. The contract required the end bents on the bridge to “be sufficiently completed to enable the grading contractor to place the fill by September 1,1954.”
(e) The contract further specified that construction work would be done by others in the vicinity of the structure sites; that since the State would not be liable for claims for damages by the bridge contractor that might result from changed conditions due to work of other contractors, it would be the responsibility of the contractor to familiarize himself with all the conditions that might affect his work and bid on the project; and that the contractor should arrange his work to cause the least amount of interference with the work of other contractors.
CONTRACT BETWEEN CORPS OP ENGINEERS AND PLAINT®? EOR CONSTRUCTION OP RAILROAD BRIDGE
5. (a) On May 6,1954, the defendant, acting through the the District Engineer, Corps of Engineers, U.S. Army, Portland, Oregon District, issued specifications, drawings and invitations for bids, to be opened on June 8,1954, for construction of the new railroad bridge over the Deschutes Eiver.' The work involved the construction of five concrete piers and two abutments and “the fabrication and erection of thru plate girder spans and appurtenances”, not including the fill for the abutments which was to be performed under separate contract by another contractor. Abutment *56 1 was to be located on the west bank and abutment 2 on the east bank of the Deschutes River, with the piers, numbered 1 through 5, running from west to east between the abutments.
(b) Bids on the railroad bridge invitation were opened on June 8,1954, and plaintiff was found to be the low bidder at $519,191.56. Young & Smith was among the unsuccessful bidders.
(c) On June 17,1954, plaintiff was notified by the Corps of Engineers that his bid was accepted. On the same day, Contract No. DA-35-026-Eng-20846 was executed between plaintiff and the defendant, acting through the District Engineer, Corps of Engineers, U.S. Army, Portland, Oregon District (hereafter referred to as “the contracting officer”).
(d) Among other things, the contract specified that work was to commence within 15 days after receipt of notice to proceed; that the concrete abutments were to be completed not later than October 1, 1954, in order to allow for construction of the abutment fills by another contractor working in the vicinity of the bridge; and that the other work was to be completed within 450 days after receipt of the notice to proceed. In addition, the contract provided for liquidated damages of $500 per day for failure to complete the abutments by the required intermediate completion date or extensions thereof and $500 per day for failure to complete all work within the specified date or extensions thereof, with liquidated damages to be assessed concurrently in the event the delays overlapped. The contract contained customary standard provisions concerning changes, changed conditions, defaults, disputes, site investigation and representations, cooperation with other contractors and time extensions.
(e) Pertinent provisions of this contract are set forth in Appendix B of this Report.
(f) Notice to proceed was received by the plaintiff on July 6, 1954, at which time construction of the highway bridge was already in progress.
(g) The October 1, 1954 completion date for the abutments was extended 15 days, or to October 15, under the provisions of Article 5 due to a delay in the consummation of agreements between plaintiff and the railroad required under paragraph SC-31 of the Specifications. For reasons which *57 are described in a later part of this Keport, the intermediate completion date for the abutments was subsequently extended to their actual completion date, December 4,1954. All work was completed and accepted on July 13,1955, within the contract dates, as extended, and no liquidated damages were assessed.
RELATIVE LOCATION OE BRIDGES
6. (a) The two bridges were to be constructed parallel with, and in close proximity to each other — being separated by a distance of about 68 feet from their centerlines. The highway bridge was to be situated directly upstream from the railroad bridge.
(b) The relative location of the two bridges is depicted in the diagram that follows:

Relative Location of Relocated, Highway and Railroad Bridges

*58 YOUNG & SMITH’S CONSTRUCTION OE A COEEERDAM
7. (a) As described in finding 4(a), Young & Smith, was awarded the contract for the Deschutes River highway bridge on April 19,1954. Prior to bidding on the contract, Wilford E. Thatcher, the general superintendent for all Young & Smith construction activity, talked to representatives of Morrison-Knudsen Company about their building a cofferdam to facilitate construction of part of the substructure of the highway bridge. Subsequently, as soon as the bridge contract was awarded to Young & Smith, Mr. Thatcher awarded a subcontract for the cofferdam’s construction to the Morrison-Knudsen Company.
(b) As originally planned by Mr. Thatcher, this cofferdam was to extend from the west bank of the Deschutes River to a point adjacent to the proposed location of Bent 6 of the highway bridge.
(c) When Mr. Thatcher learned that bids were to be obtained for the railroad bridge, he directed that work not be started on the cofferdam until the identity of the successful bidder became known. What occasioned this direction was his thought that the successful bidder on the railroad bridge would work with him and share the cost of having the cofferdam put in.
(d) Against this background, on or about June 8, 1954, shortly after the railroad bridge bids were opened disclosing that plaintiff was the low bidder, Mr. Thatcher telephoned him for the main purpose of having him defray part of the cost of the cofferdam. In the course of the call, Mr. Thatcher indicated that he was planning to start construction of the cofferdam in about a week and that the Morrison-Knudsen Company had, in fact, already quarried the rock therefor. He suggested that plaintiff should pay part of the cofferdam’s cost, since it would benefit him in the construction of two of the railroad piers; expressed willingness to work with plaintiff on the cofferdam; advanced the suggestion that the two meet at the job site and plan their work; and discussed the joint use of equipment.
The plaintiff replied that he did not know if he would be awarded the contract and thus could make no commitment *59 with, respect to the cofferdam. He stated that he was leaving for California and would get in touch with Mr. Thatcher when he returned.[6]
(e) Plaintiff went to California shortly after a pre-award conference[7] in order to purchase a Beadymix concrete plant for use in the construction of the bridge. Upon his return a week or ten days later, he made several unsuccessful efforts to reach Mr. Thatcher by telephone.
(f) Mr. Thatcher made no further effort, after his first telephone call, to communicate with plaintiff. This was because Mr. Thatcher already had his plans made for the cofferdam and, as he testified, he was in “almost the position of a beggar asking [plaintiff] to pay [him] a portion of the cofferdam price.” . . .
8. Not having received any word from the plaintiff, Mr. Thatcher had construction of the cofferdam started about June 22,1954.[8] It was completed about July 6,1954.[9]
9. When completed, the Young & Smith cofferdam constituted a solid and continuous rock and sand-fill barrier extending from the proposed location of Bent 1 of the highway bridge on the west bank of the Deschutes Kiver to a point adjacent to the proposed location of Bent 7 and approximately opposite the proposed location of Pier 5 of the railroad bridge. While originally planned to terminate at the Bent 6 location,[10] the pressure of water in that area was so great as to threaten a probable washout, thus making necessary an extension to Bent 7, where it was “anchored on” to a small island.
*60 10. Prior to the construction of the cofferdam, the Deschutes Diver flowed through a main channel, 130 to 155 feet wide, which ran between the proposed location of piers 3 and 4. The cofferdam diverted the entire flow of the river from this channel to the east bank so that the river passed over the proposed location of Abutment 2 and Pier 5 of the railroad bridge with considerable depth, speed and force.
11. (a) Dather than a solid cofferdam damming a substantial part of the river, a better method of dewatering— and one constituting an accepted engineering practice— would have been construction of a series of individual cofferdams connected by temporary bridging for access purposes. This method in contrast to the one used by Young & Smith would not result in diverting the main channel of the river to any extent, since the stream would flow through the intervals between the individual cofferdams.
(b) When plaintiff bid on the highway bridge, it was his plan to build individual cofferdams for all bents located in the river and to connect them with temporary bridging.
CHARACTERISTICS OF DESCHUTES RIVER; CONTRACT DRAWINGS,* SITE INVESTIGATION
12. (a) The Deschutes Eiver is one of the most uniform flowing streams in the United States, with a low season in the early fall and a high-water season during the winter and early spring.
(b) The site of the bridges is about iy2 miles from the confluence of the Deschutes and Columbia Divers. In that area, the Deschutes Diver has a variable amount of water, depending upon the season of the year, due to backwater from the Columbia Diver. Thus, when the Columbia Diver is at flood or high-water stage, this area of the Deschutes Diver also reaches its peak level. The high-water condition exists from May through mid-July when it starts to recede. During the months of August, September, October, November, and December, the water-level conditions in the bridge area are about the same.
(c) The relocated bridge sites are located at the bottom of some rapids through which the river flows with great *61 speed. In the vicinity there are several alternate channels which, coupled with the rapids, result in a complicated flow pattern. The white water and side channels along both banks, prior to bidding, were quite evident to any observer.
(d) The normal width of the river at the location of the relocated bridges is 200 to 250 feet. The distance between the railroad bridge abutments is about 500 feet.
13. (a) The contract drawings prepared by the Corps of Engineers and approved by the contracting officer on March 16, 1954, showed that at the water elevation existing on December 3, 1953, Abutments 1 and 2 and Piers 2 and 5 of the railroad bridge would be in the dry and Pier 1 practically in the dry. The drawings also showed that at this water elevation, Pier 3 would be in about 4 feet of water and Pier 4 in about 1 foot of water.
(b) With the possibility of a variance of a foot more or less, the contract drawings would represent the water elevations at these abutment and pier locations from August 1, 1954, to the last of December, 1954. More specifically, from the contract drawings it could be reasonably estimated that during the August to December period, about iy2 feet of water would be touching the edge of Abutment 2 and 1 to 2% feet of water would be around part of Pier 5.[11]
14. (a) At the pre-award conference described in finding 7(e), Mark Clayton, a professional engineer in the employ of the Corps of Engineers, mentioned to plaintiff that there would be a water problem on the east bank, primarily from Piers 3, 4 and 5 and Abutment 2. Plaintiff replied that he did not think there was any water problem there at all, that it was going to be a very easy thing to handle.
(b) The water problem to which Mr. Clayton made reference, consisted, as he testified, of about 1 to 1% feet of water that would be touching the edge of Abutment 2 and the 1 to 2% feet of water that would be around part of Pier 5.
15. Plaintiff visited the job site before and after bidding on the railroad bridge contract. In addition, he made an *62 independent investigation of the river conditions that would likely prevail during the time of performance, by examining charts in the defendant’s Hydrology and Meteorology Section showing the water flow in the area at different times of the year. These studies of surface and subsurface conditions indicated that while Abutment 2 and Pier § could not be constructed completely in the dry, the amount of water during performance of the contract would not be substantial and that elaborate cofferdamming would, therefore, be unnecessary.[12]
PLAINTIFF’S ALLEGATION OF CHANGED CONDITIONS AND REQUESTS FOR STOP ORDER ON ABUTMENT 2
16. The notice to proceed fixed July 14,1954, as the date work was to be started, but due to a delay in the consummation of agreements between plaintiff and the railroad required under paragraph SC-31 of the Specifications, an extension was granted to July 20, 1954, for commencement of actual construction work.
17. Construction of the highway bridge was already in progress when plaintiff received his notice to proceed on the railroad bridge contract. During the period for which claims are made, construction on both bridges was being performed simultaneously, but was at different stages of completion.
18. To meet the abutment completion date of October 1, 1954,[13] the plaintiff planned (a) to commence operations on Abutment 1 since it was in the dry and very accessible; and (b) to start Abutment 2 shortly thereafter (around August 1). However, by reason of the river’s diversion to the area of Abutment 2 and Pier 5, caused by the Young & Smith cofferdam, plaintiff proceeded around July 30, 1954, with the construction only of Abutment 1, Pier 1 and Pier 2.[14]
*63 19. (a) At various times from the first part of August to September, 1954, the plaintiff, as hereinafter set forth, asserted to representatives of the Corps of Engineers that changed conditions at the site had resulted from the Young & Smith cofferdam, so that Abutment 2 could only be constructed after plaintiff first built a cofferdam of his own at a great increase in cost. Such a cofferdam, plaintiff stated, would result in the near damming of the entire river and cause both extreme danger to the Young & Smith cofferdam and to life and property.
(b) At various times during this period, the plaintiff, as hereinafter set forth, orally and in writing, requested the contracting officer to issue a stop order on construction of Abutment 2, together with an extension of the completion date thereon, until Young & Smith had completed its work to the stage where it could pull back its cofferdam from the Bent 7 area, and thus eliminate what plaintiff has since described as the “great howling mass of water going over [that] whole work area.”
(c) As hereinafter set forth, the contracting officer took the position that there was no evidence of changed conditions within the meaning of the contract and no basis for issuance of a stop order or a time extension for completion of the abutments.
20. (a) On August 3,1954, the Corps of Engineers’ Resident Engineer (hereafter referred to as “the Resident Engineer”) met with two representatives of the plaintiff to discuss conditions at the railroad bridge site caused by the Young & Smith cofferdam. He. advised them to arrange a conference with Young & Smith and indicated that his office would cooperate.
(b) On August 7, plaintiff’s general superintendent wrote to the contracting officer making reference to the earlier meeting and stating in part:
At the time of bidding the project, conditions at the site indicated that it would be possible to construct abutments 1 and 2 and piers 1, 2 and 5 in the dry. Since bidding the project, Young & Smith have constructed a gravel and rock fill out to approximately pier 4 and upstream from the railroad bridge site, thus forcing the river flow in. the area of the railroad oridge pier 5 and *64 abutment 2. Because of this fill upstream from the site, it is now necessary that we proceed, only with the construction of abutment 1, pier 1 and pier 2 and delay construction of pier 5 and abutment 2 until such time as the water can be diverted back to the original channel through piers 3 and 4.
The effect of this change condition, both on contract time and cost, is uncertain at this time. We, therefore, request that a conference be called in your office between representatives of Young and Smith, the State Highway Bridge Department representatives, representatives from this concern and yourself, in order that we may coordinate operations on the two bridge projects and determine definitely just what effect operations of Young and Smith will have on our contract, both as to completion time and construction costs.
(c) Several weeks later, on August 21, plaintiff also wrote to the contracting officer claiming a changed condition in the area of Abutment 2 as a result of the Young & Smith cofferdam. He stated that that concern’s attitude was such, however, that “we have not been able to arrange a conference and believe that the only way [it] can be arranged is for you to take the necessary action to set up a conference on an official basis.”
(d) In light of these considerations, the Corps of Engineers itself arranged a conference on August 26 between the Resident Engineer, State of Oregon representatives, plaintiff, and Mr. Thatcher, among others, for the purpose of finding out what Young & Smith’s plans and schedule were.[15] During the meeting, Mr. Thatcher said that construction on the west side of the highway bridge would be completed around the first of the year, at which time he would remove the cofferdam.[16] In the course of the conference, the Corps of Engineers’ representatives insisted that plaintiff start construction of Abutment 2 so that it could be completed by October 1, the date specified in the contract, and suggested that Mr. Thatcher pull back his cofferdam so as to allow *65 plaintiff to get his bridge in. Mr. Thatcher refu:ed because, as he testified, “nobody offered to pay for the thing; so I just told them I wasn’t going to pull out until I was done and I left the meeting.”
(e) This conference was followed by a further letter from the plaintiff to the contracting officer on August 28. Again contending the existence of a changed condition, plaintiff requested issuance of a “Stop Order under your authority of Article 3, Changes, in which you stop construction on Abutment 2 and Piers 4 and 5 until such a time as the river can be diverted from the eastern shore of the Deschutes River and the work can be done in safety without endangering either life or property . . . .” He added: “In the event such an order should come from you and should entail additional expense, I shall at the time they can be determined, forward you a claim for these additional expenses.”
In that letter, the plaintiff also wrote that if Abutment 2 and Piers 4 and 5 were to be completed within the contract time, “elaborate riprapping and cofferdams will be necessary” causing a large amount of additional expense; that “if we go out with rock riprap in order to set up a cofferdam at Abutment 2, we will endanger, and in all probability destroy”, Young & Smith’s cofferdam and damage the highway and railroad bridge; that he had placed a contract for construction of a gravel fill to Abutment 2 which was stopped when it was noticed that the river level had increased approximately three inches and was eroding Young & Smith’s cofferdam and endangering life and property; and that the gravel-fill contractor has been reluctant “to put any heavy rock in there for fear (of) their liability in causing damage and/or failure of the . . . cofferdam and endangering life and property.”
(f) By letter of September 8, the contracting officer denied the request for issuance of a stop order and directed the plaintiff to take such steps as might be necessary to complete the abutments by October 1, 1954.[17] The contracting officer recited that his representatives had made a prelimi *66 nary investigation of the job site, analysis of which indicated that no stop order was justified at that time; that Young & Smith “had made every effort to arrange the satisfactory correlation between the two jobs in order to minimize any possible interference” but “on being unable to make such arrangement with you, they started construction of their cofferdam on June 13,1954”;[18] that in his opinion the Young & Smith cofferdam had been a benefit rather than a handicap to plaintiff’s operations since it enabled him to perform a large part of his work in the dry; that if a cofferdam were constructed by plaintiff to include Pier 5, it would probably endanger Young & Smith’s cofferdam, but one “constructed to include only Abutment 2, which is of primary importance as to completion date, will not cause failure nor endanger [Young & Smith’s] cofferdam”; that there was no “evidence of change [d] conditions within the meaning of [the] contract, and no present basis for extension of completion time . . . [for] the concrete abutments, nor any basis for issuance of a stop order.” The contracting officer further requested plaintiff to furnish “immediate information as to [his] plan of operations and work schedule for completion of the abutments.”[19]
(g) On September 10, the plaintiff wrote to the contracting officer that Young & Smith had started the cofferdam before he received the award; that at the time of the award, he had tried unsuccessfully to contact them; that he “never at any time anticipated that Young & Smith would proceed as they have done”; that when he had “figured” the highway bridge contract, he “never . . . contemplate [d] diverting the entire flow of the river to the east side as [Young & Smith] have done”; that when he bid on the railroad bridge contract, he “had anticipated cofferdamming in one operation to construct Abutment 2 and Pier 5” [20] and to “do this *67 in separate operations will greatly increase our costs.” Plaintiff further stated that in view of the contracting officer’s refusal to grant an extension of time on a stop order in connection with Abutment 2 and Pier 5, he would “immediately proceed with all expedition to construct these structures”; that he was writing to Young & Smith “advising them of [his] plan to do this and requesting them to protect themselves”; and that he would submit early the next week a plan of operations and a work schedule, as requested.
(h) Plaintiff also wrote to Young & Smith on the same day [September 10] stating that he had received a letter from the Corps of Engineers advising that Abutment 2 and Pier 5 [21] had to be completed by October 1. He declared that the Corps of Engineers was concerned about the timely construction of Abutment 2 because of its commitments with and potential claim from the fill contractor; that when he bid the job, he had not anticipated that Young & Smith would install such an extensive cofferdam as to divert the entire flow of the river; that he had attempted previously to put in a rock and gravel fill from the west bank of the river, but that a great portion thereof had been washed away due to the river’s diversion; that in view of the directions received from the Corps of Engineers, it was necessary that plaintiff “immediately start filling and cofferdamming to construct this portion of our contract.”
Plaintiff concluded by notifying Young & Smith that he could not “assume any responsibility for damage to [Young & Smith’s] operations caused by [plaintiff’s] diversion of the river or raise of the water level”; and that Young & Smith “should, therefore, take immediate steps to strengthen and raise [its] cofferdam”.
(i) On September 14, the contracting officer replied to plaintiff’s September 10 letter. After observing that the plaintiff had been directed to proceed with the construction of Abutments 1 and 2 pursuant to the contract and that the construction of Pier 5 at that time was entirely for the contractor’s convenience, the contracting officer continued:
*68 Inasmuch as you were also a bidder on the State highway bridge and were required to fully investigate conditions pursuant to the problems involved by your contract, you were required to become acquainted with the problems involved and the need for close cooperation between all contractors. Any damages caused Tby your acts, particularly when such damages could be avoided by cooperation with the State highway contractor, are your liability.
PLAINTIFF’S REQUEST FOR CORPS OF ENGINEERS’ DIRECTIVE REQUIRING YOUNG & SMITH TO PULL BACK ITS COFFERDAM
21. (a) As an alternative to issuance of a stop order, the plaintiff on various occasions requested the contracting officer to invoke his alleged authority under the highway bridge contract and direct Young & Smith to pull back its cofferdam to Bent 5 until plaintiff could complete Abutment 2.
(b) The contracting officer refused to do so, claiming that there was no privity of contract between defendant and Young & Smith and that his office had no contractual right or authority to control the actions of the highway bridge contractor.
PLAINTIFF’S CONSTRUCTION OF A ROCK JETTY AND COFFERDAM
22. Plaintiff commenced, on or about September 11,1954, construction of a rock jetty near Abutment 2 in order to break the considerable flow of the river before putting in a cofferdam. To build this jetty, the use of derrick-size rock was necessary, since smaller-size rock would have been washed down the river.
23. (a)- By September 14, plaintiff had constructed a jetty and cofferdam from the east bank of the river[22] to a loca *69 tion in such close proximity to the east end of the Young & Smith cofferdam, that the river was compressed to a channel of about 30 feet wide and for a few minutes was virtually closed.
(b) So great was the water pressure, that the end of the Young & Smith cofferdam started to collapse, since it was lower and constructed of less substantial materials than the plaintiff’s jetty and cofferdam.[23] When this happened, the plaintiff placed an emergency telephone call to the contracting officer to advise him of the situation. The plaintiff stated that his cofferdam would wreck the Young & Smith cofferdam and again requested the issuance of a stop order on the abutment until Young & Smith had removed a sufficient portion of its cofferdam to alleviate the water conditions at the abutment area. The contracting officer refused, insisting that the plaintiff proceed and complete the abutments within the contract date. He also called plaintiff’s attention to the contract provisions for liquidated damages on failure to meet the contract date, and advised him that the Corps of Engineers had no authority to do anything about the Young & Smith problem; that this was plaintiff’s responsibility.
(c) On the next day, September 15, the plaintiff sent a letter to the contracting officer stating that after the telephone call on the previous day, he had “knocked a hole in [his] cofferdam to lower the water temporarily and went and conferred with Young & Smith’s superintendent.” The letter continued in part:
... It appeared to us at that time that if they would knock a portion of their cofferdam extending back to somewhere between piers 5 and 6 of their job, that sufficient diversion could be effected to permit us to proceed and permit them to proceed with other portions of their work. We could get no cooperation, so we again commenced cofferdaming [sic] and I am advised by telephone this morning that Young & Smith are now *70 removing a portion of their cofferdam extending back to pier 6. The flow of the river at the points to which we have now extended our cofferdam is so great that it will take considerable larger rock than we have so far found available in order to hold the cofferdam. It is possible that, when and if Young & Smith complete the removal of a greater portion of their cofferdam, that this flow will be diverted into that area and it will make our cofferdaming [sic] a little easier. . . .
(d) In order to salvage the situation, Young & Smith, on September 15, pulled back its cofferdam to Bent 6 and later to Bent 5, a distance in all of about 90 feet.
24. (a) Because of the great pressure of water flowing through the area of Abutment 2 caused by the Young & Smith cofferdam, it was substantially more expensive for plaintiff to obtain a dry excavation for constructing the abutment than if the Young & Smith cofferdam had not extended that far. This increased expense was due to the necessity of installing a structure sufficiently large and heavy to withstand the force of the river, as well as the need for using heavy material.
(b) However, considering the water conditions at the site, plaintiff could have adopted a less expensive and yet better and more feasible dewatering method. This would have entailed placing heavy rock in the shape of a doughnut at the abutment area to break the flow of the river and then filling the center with an impervious, sandy-loam of a type which plaintiff used. A rock-fill island of this type could have been connected to the east bank by a bridge, thus allowing the river flow to proceed downstream relatively unimpeded.
PEAINTIEe’s EURTHER request EOR EXTENSION AND STOE ORDER
25. (a) Despite the pull-back of the Young & Smith cofferdam to Bent 5, the plaintiff still experienced difficulty in eliminating all the water necessary to obtain a dry excavation for Abutment 2. He therefore requested, in a letter dated October 18, 1954, an extension of 120 days in the performance of the contract and a stop order. His letter to the contracting officer reads, in part:
*71 Your failure to require the necessary cooperation by the State and its contractor has delayed my operations and I am now formally requesting an extension of time of one hundred and twenty days in the performance of my contract. I have repeatedly requested that the State and its contractor be required to remove a sufficient portion of the cofferdam which it threw into the river from the west bank, thereby diverting the entire flow of the stream into the immediate area of abutment 2, which was the first work that I was required by my contract to complete, and piers 4 and 5 which would normally be constructed at the same time. At the present time it is impossible, due to the lack of proper water diversion, to construct abutment 2 and have the footings dry for the pouring of concrete. We have driven three different rows of sheet piling in an attempt to dewater the area but the unnatural diversion of the flow of the stream still prevents it from drying out properly.
It is, therefore, my request that we be given a stop order on the construction of abutment 2 and piers 4 and 5 until such time as the State and its contractor has [sic] removed a sufficient portion of their cofferdam to give adequate water diversion.
(b) By letter of October 27, the contracting officer denied the requests. He wrote that there was no privity of contract between his office and the State of Oregon highway bridge contractor; that “there has been no direct interference by the State contractor with your work and on the west abutment the State contractor’s cofferdams have been of considerable benefit to your work”; that plaintiff’s “lack of progress ... is considered inexcusable.” He emphasized that this decision was final, stating that the “claim is without merit and is . . . denied in its entirety”, but could be appealed under the “Disputes” provision of the contract.[24]
(c) Plaintiff appealed from this decision by letter dated November 26.
(d) Coincidentally, on the same day, the contracting officer conferred with the plaintiff, reconsidered his previous decision and agreed to extend the time for completion of the abutments by 50 days, to December 4,1954.[25] This extension *72 was formalized by Modification No. 5 [26] issued on November 29 and signed by the plaintiff under protest. The Modification recited that it had been determined that “delay in the performance of [the] contract was due to causes beyond [plaintiff’s] control and without [Ms] fault or negligence, namely, acts of another contractor in the performance of a contract with the Government.” The Modification was accompanied by findings of fact which stated in part:
Necessity for the change. . . . Prior to award of this contract with Lee Hoffman, the State of Oregon’s contractor for the relocation of the State Highway bridge constructed the cofferdam for the five piers on the west bank of the Deschutes Liver. This cofferdam caused the river current to flow over the area of the proposed east abutment for the relocated railroad bridge. This contractor, in constructing a cofferdam for the railroad bridge east abutment, was unable to dewater the cofferdam area until the State contractor removed a portion of the Mghway bridge cofferdam to relieve the water pressure. The contractor was finally permitted, with the concurrence of the Union Pacific Lailroad, to pour the concrete footing of the east abutment under water. Plowever, the difficulties in unwatering the abutment site delayed the contractor a total of 50 days. There- • fore, it has been determined that he is entitled to a time extension of 50 days for the work described in paragraph SC-la(l) of the contract specifications, thereby establishing 4 December 1954 as the specified completion date for this phase of the work.[27]
26. As previously set forth in finding 5 (g), work was completed and accepted on July 13, 1955, within the contract dates as extended, and no liquidated damages were assessed.
CONTRACTING OEEICEr’s DENIAL 0E CLAIM EOR INCREASED COSTS ALLEGEDLY INCURRED BECAUSE OE CHANGED CONDITION
27. On June 7, 1956, plaintiff filed a claim with the contracting officer for $71,675.31 as costs allegedly incurred during the period September 11,1954 to November 20, 1954, *73 by reason of constructing Abutment 2 under a “changed condition.” The burden of the claim was that the diversion of the river by the Young & Smith cofferdam to the area of Abutment 2 and Pier 5 of the railroad bridge constituted a changed condition under Article 4 of the contract, and that defendant breached the contract (a) by requiring the plaintiff to work under the changed condition; (b) by failing to “prevent interference from [Young & Smith] in the performance of another contract with the Government”; and (c) by failing to issue a stop order because of such changed condition. The claim contained other subsidiary contentions, including a contention that defendant had failed to provide plaintiff with reasonable working space and area and reasonable working conditions.
28. (a) On November 5, 1956, the contracting officer denied plaintiff’s claim by findings of fact and decision on the various contentions presented by plaintiff.[28] The specific findings were preceded by a detailed, chronological summary of pertinent correspondence from plaintiff during contract performance and the contracting officer’s prior responses to and decisions on plaintiff’s contentions, together with a chronological listing of pertinent contract performance dates and citations to relevant provisions of the contract and specifications.
(b) The contracting officer’s findings and decision are set forth in Appendix C of this Beport.
DECISION OE CORES OE ENGINEERS CLAIMS AND APPEALS BOARD AEETRMING CONTRACTING OEEICER’s DECISION AND DENYING plaintefe’s APPEAL
29. (a) Plaintiff, on November 8, 1956, filed a timely notice of appeal from the findings and decision of the contracting officer pursuant to the disputes provision (Article 6) of the contract which reads:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his *74 decision to writing and mail or otherwise furnish, a copy thereof to the- Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive:[29] Provided, That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
(b) Almost 10 months later, the plaintiff, on September 13,1957 — 4 days before the Board hearing — filed an amended claim with the contracting officer. As amended, the claim was a restatement of his initial claim then on appeal, except for (1) the additional allegation that the contracting officer had acted arbitrarily, prejudicially, and capriciously; and (2) the inclusion of a new item of $17,324 representing the amount claimed by Young & Smith for damage to its cofferdam. Thus, under the amended claim the total amount sought by plaintiff was increased from $71,675.31 to $88,999.31.
(c) A hearing on plaintiff’s appeal was held on September 16, 1957, before the Board, acting for the head of the department under the disputes provision of the contract. At the hearing, both parties were represented by counsel. Opening statements and oral argument were permitted and made. Evidence, both documentary and testamentary, was adduced by both parties. After the close of the hearing, both parties were given the opportunity to and did submit briefs in support of their respective position.
*75 (d) On May 23, 1958, the Board entered its decision affirming the contracting officer’s findings and decision and denying plaintiff’s appeal. That decision reads in pertinent part:
Undoubtedly, the appellant when he submitted his bid did so without giving any consideration to a possible diversion of the main stream from its channel to the location of the east abutment. This diversion was not mentioned in the contract documents. When he encountered this condition on the job he felt it to be a changed condition under the terms of the contract. It was not a subsurface or latent physical condition at the site differing from those indicated in the contract. It was instead a strictly man-made condition caused by the operations of another independent contractor, and dependent upon his discretion and judgment. Appellant’s contract included the information that other contractors would be working on the site and required cooperation between them. There was nothing unusual under these circumstances with respect to river diversion. It was to be expected. In order to accomplish the desired construction on both contracts, either diversion or some other method of river control was mandatory. The method was properly left to the successful bidders. The diversion as accomplished was not an unknown physical condition at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
Both contracts enjoined mutual cooperation. Such cooperation is to be expected on any project and of necessity is an inherent ingredient of the construction industry. From the very outset of this project it was not achieved between two contractors, each of whom has bid on both contracts and were fully conversant with its extreme importance. The contracting officer is not designated by the contract as the arbiter and quite properly refused to take sides in the matter. When it was made evident to him that the scheduled completion of the abutments could not be timely accomplished because of interference he granted an extension.
(e) The findings and decision of the Board are set forth in Appendix D of this Beport.
(f) The Board declined to consider the amended claim, stating:
*76 The jurisdiction of this Board is appellate in nature and does not extend to claims as such which have never been decided by the contracting officer. Since the amended claim was submitted to the contracting officer shortly before the hearing on the original claim, and since he was unable to render a supplemental decision within the short time remaining, it follows that no appeal therefrom could be made.
This item of $17,324 was, therefore, not considered or disposed of by the Board’s decision on the merits.[30]
CONCLUSIONS REGARDING CHANGED CONDITION
30. (a) On the basis of the administrative record before the Board, it is found as a fact, first that the Board’s decision is not supported by substantial evidence;[31] and second, that the plaintiff encountered, during performance of his contract, an unknown physical condition at the site of an unusual nature, differing materially from one ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. The changed condition, it is found, consisted of a water problem in the Abutment 2 area substantially greater than plaintiff could reasonably foresee when submitting his bid, and resulted from the upstream contractor’s construction of a solid cofferdam which dammed the main channel of the river and diverted it to the area of the east abutment — an occurrence which plaintiff likewise could not reasonably foresee.
(b) More particularly, the great weight of the evidence before the Board establishes that when plaintiff submitted his bid for the railroad bridge contract, he could reasonably foresee, from examining the contract drawings, scrutinizing hydrological charts and visiting the job site, that the Abutment 2 area would contain only a small amount of water. He, therefore, could anticipate that only minor coffer-damming for construction of that substructure would be necessary.
*77 Further, the great Aveight of the evidence before the Board establishes that when plaintiff submitted his bid, he could not reasonably anticipate that the upstream highway bridge contractor would construct a solid rock and sand-fill continuous barrier extending from the west bank of the river to Bent 7, thus diverting the main channel of the river to the Abutment 2 area. For the thrust of the undisputed testimony makes it clear that a reasonable and prudent person bidding on the railroad bridge would, in the circumstances presented, expect the upstream contractor to construct a series of individual cofferdams, connected by temporary bridges. This is an accepted engineering method which, if used, would have permitted the main channel of the river to maintain its flow relatively undisturbed. Indeed, the defendant’s ovm engineer witness testified that individual cofferdamming “would be the better way to do it”; that “that would be the way I would have done Young & Smith’s cofferdam.” Conversely, a prudent person in the position of the plaintiff could hardly contemplate that the upstream contractor would, instead, dam up the main river channel with the inevitable result of hobbling the doAvn-stream contractor’s construction of the east abutment.
(c) Both the highway and the railroad bridge contract enjoined mutual cooperation. Furthermore, such cooperation between contractors is to be expected on a project of this kind. However, it is found from a great preponderance of the credible testimony, that there was very little that the plaintiff could do by way of cooperating with the upstream contractor in constructing the latter’s cofferdam. In the first place, when submitting his bid, the plaintiff could not cooperate with Young & Smith since the latter was a rival for that contract, as were the two for the highway bridge contract. Second, when Young & Smith’s general superintendent, Mr. Thatcher, telephoned the plaintiff, after the railroad bridge bids were opened, Mr. Thatcher testified that his plans had already been made for building a solid barrier from the west bank to Bent 6; that this was what he was going to do in any event. Moreover, at the time in question, Mr. Thatcher himself did not anticipate that water conditions at Bent 6 would be such as to make necessary extending *78 bis cofferdam to Bent 7. Third, the primary purpose of Mr. Thatcher’s call was not to obtain plaintiff’s cooperation but to suggest that the plaintiff share in the cofferdam’s cost. While the record is clear that the plaintiff did not respond to this suggestion with alacrity or enthusiasm, the record is equally clear that plaintiff could scarcely expect that Mr. Thatcher would dam the river to the Bent 7 location, causing it to flow over the Abutment 2 location with considerable depth, velocity and force. Yet this was precisely the situation confronted by the plaintiff when on July 6, he received notice to proceed on the contract.[32]
(d) Considering the water conditions prevailing in the Abutment 2 area on September 11, it is found that plaintiff could and should have adopted a less expensive and more feasible method for dewatering than the construction of a rock jetty and cofferdam to the job site. The preferable method would have involved construction at the abutment area of a rock-fill island connected to the bank by a temporary bridge. Accordingly, the amount of any equitable adjustment to plaintiff for increased cofferdamming costs should be based on an island-type of cofferdam rather than on the solid type installed by plaintiff.
(e) It is found that plaintiff benefited from the Young & Smith cofferdam by being able to construct various substructures at the west side of the bridge, particularly Pier 3, in the dry. For that reason, any equitable adjustment to plaintiff for increased costs should be reduced by the amount of such monetary benefits.
PLAINTIEe’s ADDITIONAL CLAIM
31. (a) As noted in finding 29(b), the plaintiff, in September, 1957, four days prior to the Board hearing, filed an amended claim with the contracting officer for the additional sum of $17,324 which represented the amount claimed by Young & Smith for damages to its cofferdam.
*79 (b) Paragraph XII of the amended claim pertains to the additional item and reads:
That subsequent to the filing of this claim, the Young & Smith Construction Company, the contracting firm which constructed the aforesaid highway bridge, has made claim for damages against claimant herein in the sum of $17,324.00, primarily upon the grounds that claimant herein damaged the dam used by the Young & Smith Construction Company in constructing said highway bridge. That any such damage sustained by Young & Smith Construction Company directly resulted from claimant’s execution of the direct orders of the contracting officer when the said contracting officer wel] knew all of the conditions and circumstances then and there existing at both projects, and that such damage to the highway bridge dam was inevitable if said orders were to be carried out, notwithstanding the fact that said contracting officer was one and the same official in said capacity for both projects with full authority to direct and control both operations thereof. That by reason of claimant having been forced by arbitary and prejudicial orders of the contracting officer to intentionally and wilfully inflict damages upon the highway bridge project,, claimant has been further damaged by said claim against him in the sum of $17,324.00
(c) As noted in finding 29(f), the Board declined to consider the amended claim for the reasons set forth in that finding.
32. Plaintiff has asserted this claim for $17,324 in paragraph XVI of his petition in this Court. The allegations in that paragraph are substantially the same as the allegations in paragraph XII of plaintiff’s amended claim which are quoted in finding 31(b). This claims item is the only one involved here which is outside of the administrative record upon which both parties agreed to rely.
33. Plaintiff adduced no proof in the proceedings before this Court with respect to the Young & Smith claim. The defendant, however, introduced documents in the form of the complaint, answer and counterclaim, and reply in Civil Action No. 8653, United States District Court, District of Oregon, entitled Dugal Young, J. F. Young and, Ralph Smith, co-partners, doing business under the f/rm name and *80 style of Young & Smith Construction Co. v. Lee Hoffman, and two depositions taken in that action, one by the defendant [plaintiff here] and one by Wilford E. Thatcher, superintendent of Young & Smith. The action was instituted in June 1956 and a formal order of dismissal was entered in April 1958.
34. The statement by the Board to the effect that “Young & Smith * * * effected some measure of recovery from the appellant herein” through the district court action was incorrect, for no payments were made by plaintiff to Young & Smith and no payment received by plaintiff from Young & Smith. In this connection, the parties have stipulated that no payments were made, that “the two parties washed out their respective claims against one another, and dismissed the case accordingly”.
35. Since Young & Smith’s claim against the plaintiff and plaintiff’s counterclaim against Young & Smith were “washed out . . . against one another,” and since no payments were made to Young & Smith by plaintiff, the plaintiff is foreclosed from asserting here a claim against the United States that is based on Young & Smith’s claim against the plaintiff. It is found, in short, that plaintiff is not entitled to recover on this claim.
APPENDIX A
PERTINENT PROVISIONS 0E CONTRACT NO. DA-3 5-020-ENG-20358, BATED JANUARY 6, 1953, BETWEEN CORPS OE ENGINEERS AND THE STATE OF OREGON
Article 1. Obligations of the State. — The State shall:
a. Furnish all services, labor, materials, tools and equipment necessary to perform the relocation and/or alterations (with the exception of the work to be performed by the Government as set forth in Article 2a hereof) of the following described facilities of Oregon State Highway, U.S. Koute No. 30:
(1) Bridges. — Design and construction of bridges at Deschutes Itiver and Fulton Canyon, including necessary clearing, grubbing, excavation and all construction work, both below and above subgrade, together with riprap at piers and abutments.
*81 c. Procure all necessary permits and licenses required by that portion of the work performed by the State; obey and abide by all applicable laws, regulations, ordinances, and other rules of the United States of America, of the State, or political subdivision thereof wherein the work is done, or of any other duly constituted public authority.
d. Make such necessary surveys and prepare such drawings, (with tire exception of surveys to be made and drawings to be prepared by the Government as set forth in Article 2a hereof), schedules and specifications in connection with the work to be performed hereunder by the State as may be required by its work, all of which shall be subject to the approval of the Contracting Officer. Any drawings, maps or specifications which may be furnished by the Government, for that portion of the work which it is to perform, shall if required by the State, be subject to approval by the State or its authorized representative before any work to which they relate is performed.
* * * * *
APPENDIX A-2
ARticle 3. Ownership and Conduct of the WorJc. — a. The facilities constructed hereunder shall be the property of the State. The State shall be responsible for all materials furnished and work performed by it.
b. The Government may award other contracts for additional or other work in connection with the same project or in the same vicinity. The State shall conduct operations so as to cooperate fully with any such work being performed by the Government and/or Government contractors and shall carefully fit its own work to that provided under other contracts as directed by the Contracting Officer. The State shall not commit or permit any act which may interfere with the performance of any such work by the Government and/or any Government contractor.
Article 4. Interference. — The State agrees that, so long as the Project is operated or maintained for the purpose as described herein, the facilities as relocated, rearranged or altered pursuant to this contract shall not be so further altered or modified nor other facilities constructed by the State so as to interfere with the operation of the Project.
*82 Aettcle 5. Inspection and Acceptance. — a. The Government shall have the right to inspect the work to be performed by the State hereunder at any time during its progress and to make final inspection upon completion thereof. Failure of the Government to object within 20 days after final inspection shall indicate satisfactory performance of the contract by the State.
* *' * * *
Article 9. Disputes. — Except as otherwise provided in this contract any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the State. Within 30 days from the date of receipt of such copy, the State may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the State shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder the State shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
APPENDIX B
PERTINENT PROVISIONS OE CONTRACT AND SPECIFICATIONS (CONTRACT NO. DA 35 — 026—ENG—20846, DATED JUNE 17, 1954) BETWEEN CORPS OP ENGINEERS AND PLAINTIFF
3. Changes
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and *83 wit,bin the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall he made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
4. ChaNGed Conditions
The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment *84 to be made, the dispute shall be determined as provided in Clause 6 hereof.
5. TERMINATION EOR DEFAULT-DAMAGES FOR DELAY-TlME Extensions
(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby, and for liquidated damages for delay, as fixed in the specifications or accompanying papers, until such reasonable time as may be required for the final completion of the work, or if liquidated damages are not so fixed, any actual damages occasioned by such delay. If the Contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.
(b) If the Government does not terminate the right of the Contractor to proceed, as provided in paragraph (a) hereof, the Contractor shall continue the work, in which event he and his sureties shall be liable to the Government, in the amount set forth in the specifications or accompanying papers, for fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay.
(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the Contractor, in- *85 eluding, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restriction, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: Provided, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof.
6. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: Provided, That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance *86 of the contract and in accordance with the Contracting Officer’s decision.
12. OTHER CONTRACTS
The Government may undertake or award other contracts for additional work, and the Contractor shall fully cooperate with such other contractors and Government employees and carefully fit his own work to such additional work as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor or by Government employees.
‡ *
SPECIFICATIONS
SW-1. Description of Work. — a. "Work tobe Done: (See Statement of Work, Standard Form 23 of the Contract).— The work consists of furnishing all plant, labor, materials and equipment, and performing all work in strict accordance with these specifications and schedules and drawings forming parts thereof for fabrication and erection of thru girder spans and appurtenances and the construction of concrete piers and abutments for the Union Pacific Railroad bridge.
b. Location. — The site of the work is located on the relocation of the Union Pacific Railroad Company main line at Deschutes River, approximately 14 miles east of The Dalles, Oregon.
$ ‡ ‡ ‡
GC-1. Scope of Work. — The work to be performed under this contract consists of furnishing all plant, materials, equipment, supplies, labor and transportation, including fuel, power, water (except any property, utility or service, if any, specified herein to be furnished by the Government), and performing all work as required by Statement of Work, Standard Form 23, of the contract in strict accordance with the specifications, schedules and drawings all of which are made a part hereof, and including such detail drawings as may be furnished by the Contracting Officer from time to *87 time during tbe prosecution of tbe work in explanation of said drawings.
* % * * *
GC-3. Site Investigation AND Repiíesentattons. — The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainities [sic] of weather, river stages, or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosectuion [sic] of the work and all other matters upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under this contract. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that the responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in contract shall be deemed only for the information of the Contractor.
❖ * * * *
GC-10. SUSPENSION oe WoRK. — The contracting officer may order the contractor to suspend all or any part of the work *88 for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the contractor, no increase in contract price will be allowed. In the case of the suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the contractor, the contracting officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the contractor, provided, however, that the suspension was not due to the fault or negligence of the contractor. Provided, further, that no suspension will be ordered or adjustments made under this paragraph for delays arising as the result of changes ordered or as the result of changed conditions encountered under the respective articles relating to Changes and Changed Conditions or as the result of any delays for which an extension of time may be granted under the Termination for Default-Damages for Delay-Time Extensions Article of this contract.
$ ‡ $ $ ‡
SC-1. COMMENCEMENT, PROSECTJTION AND COMPLETION.— a. Tire contractor will be required to commence work under this contract within 15 calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use not later than the dates specified below. The time stated for completion shall include final clean-up of the premises.
(1) The concrete abutments shall be completed not later than October 1, 1954..
(2) All other work under this contract shall be completed within 450 calendar days after the date of receipt of notice to proceed.
5. The completion date given under paragraph SC-la(l) is necessary in order to allow for construction of the abutment fills by another Contractor working in the vicinity of this bridge.
*89 SC-2. Liquidated Damage. — a. In case of failure on the part of the contractor to complete the work within the time fixed 'in the contract or any extensions thereof, the contractor shall pay the Government as liquidated damages the sums specified below for each calendar day of delay until the work is completed or accepted.
(1) The sum of $500.00 for each calendar day of delay in the work described in paragraph SC-la(l).
(2) The sum of $500.00 for each calendar day of delay in the work described in paragraph SC-1«(2).
b. In the event of failure to complete the work on the scheduled completion dates, and in event the delays overlap, liquidated damages will be assessed concurrently.
SC-3. Items of Woee. — A brief description of each item and the estimated quantity thereof are shown in the schedule attached to the bid form and listed in Statement of Work, Standard Form 23 of the contract. Within the limit of available funds, the contractor will be required to complete the work specified herein in accordance with the contract and at the contract price or prices, whether it involves quantities greater or less than the estimated amounts so listed.
% * * #
SC-7. Physical Data. — Information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn therefrom by the contractor.
a. Subsurface Investigation. — Investigations consist of four 'hand dug pits to the top of rock and four diamond drill holes into the basalt bedrock. The drill cores may be examined at the Corps of Engineers Big Eddy field office and results of the other investigations are available for examination in the Portland District Office.
b. Stream Data. — A table of run-off data recorded at Moody, Oregon, 1 y2 miles upstream from mouth, and further hydrographic data may be inspected in the Portland District Office.
*90 SC-27. CoopeRatioN With Othee Contractors. — During the period of operations under this contract, contracts for other work on the project site will be in force. The contractor shall so arrange his work and plant as to reasonably cooperate with other contractors, as may be determined. No extra compensation on account of cooperation required will be allowed. (See Article 12 of the contract) All contracts for work on this project do or will contain provisions similar to those stated in this paragraph.
* # * * *
SC-31. AGREEMENT POR PROTECTION OP OTHERS.-The work covered by these specifications involves the property and operations of the Oregon-Washington Eailroad and Navigation Company. It shall be incumbent upon the Contractor, prior to commencement of work hereunder to make and enter into an agreement with the Oregon-Washington Eailroad and Navigation Company, a corporation organized and existing under the laws of the State of Oregon, and its lessee, Union Pacific Eailroad Company, a corporation organized and existing under the laws of the State of Utah (hereinafter jointly and severally referred to as “Eailroad”) for the protection of the Eailroad’s property and facilities and for indemnification of the Eailroad for loss and damage, injury or death resulting from or growing out of xhe Contractor’s work under the contract whether performed by himself or his subcontractor (s). Bonds or insurance shall be procured by the Contractor for protection of the Eailroad as specified in the agreement. A copy of the agreement the Contractor will be required to make and enter into is attached hereto and made a part hereof as “Exhibit A”. No separate or direct payment will be made to the Contractor for execution of the above agreement but all costs thereof shall be considered incidental to and included in the contract prices for the various pay items in the schedule.
TECHNICAL PROVISIONS

Section 1. Excavation

1-01. Scope. — The work to be done under this section consists of furnishing all labor, equipment and materials and *91 performing all work necessary to complete all excavation required for tbe piers and abutments indicated on the plans, including any work necessary to keep the foundations free of water.
‡ ‡ ‡ ‡
1-06. MeastjRemeNt AND Payment. — a. Measurement. * * *
6. Payment. — The number of cubic yards of excavation unclassified, as determined above will be paid for at the contract price per cubic yard for Item No. 1, “Excavation, unclassified”, which price and payment shall be full compensation for performing all excavation, foundation cleanup, dewatering, shoring, backfill and other work required to complete this portion of the construction, all in accordance with the drawings and specifications.
APPENDIX C
CONTRACTING OEEICER’s EINDINGS AND DECISION
It is understood that your claim is based on costs incurred between period September 18 and November 19, 1954.
(4) The State of Oregon awarded its contract to Young & Smith on April 19, 1954, and specified that the end bents of the bridge be sufficiently completed to place the fill by September 1, 1954. Subsequently this date was extended to November 10, 1954. Young & Smith started their west bank cofferdam on June 13, 1954, and completed all work under their contract by May 31, 1955.
(5) Your contract was awarded June 17,1954, with notice to proceed signed July 6, 1954. The contract specified that the concrete abutments were to be completed not later than October 1, 1954. This was your first scheduled contract work, however, you chose to work on piers 1, 2 and 3 rather than expedite completion of work on abutments 1 and 2. Subsequently, the Government extended the abutment completion date to December 4, 1954 by Change Order No. 5. All work was completed and accepted July 13, 1955.
(6) The work on the two bridges by your firm and the State contractor was performed almost simultaneously. The two bridges are approximately parallel and 68 feet between *92 centerlines. Both your firm and Young & Smith bid on both jobs. As aforesaid, during the period for which claims are made construction operations on both bridges were being performed simultaneously but at different stages of completion.
(7) The Government paid the State of Oregon in 1953 a lump sum amount for necessary relocation work on its highway system due to construction of The Dalles Dam Project. The Government had no part in the letting of the State’s contract to Young & Smith. Hie specifications and plans were drawn up by the State through its own facilities and they directed and supervised the entire operation of Young & Smith without intervention by the Government.
(8) Due to the close proximity of the two work sites, good engineering practice in construction operation would normally call for close cooperation between the two contractors. It is my finding Young & Smith made diligent and proper effort to secure such cooperation from your firm but your firm failed to cooperate with the State contractor pursuant to the express direction of your contract and, in fact, your 'firm engaged in conflicts with the State contractor thus hampering and hindering both activities rather than aiding and abetting them in a proper spirit of cooperation. Abutment No. 2 and pier No. 5 for the railroad bridge were located in an area subject to normal river flow. The work of the highway contractor being first in being was a readily foreseeable event.
(9) During the construction period here involved analysis of the comparative daily hydrographs for the Deschutes River reveals only a median flow. Therefore, I conclude that the rate of discharge of the Deschutes River between September 13 and November 19, 1954, was a. normal and to-be-expected river flow. The natural result of the state highway contractor’s cofferdam in diverting an additional flow of water through the abutment 2 and pier 5 area for the railroad job was likewise readily foreseeable. In short, it is my finding that these results were situations that should have been contemplated within the terms of the railroad bridge contract especiallv in view of your familiarity with the area and experience in bidding on the state job.
*93 (10) The railroad bridge job was one in which time was of the essence and the Contracting Officer conld not give yon an indefinite stop-order or extension of time. The entire relocations program was keyed to timely completion of your work. Such interference as resulted from actions of the State highway contractor were normal and proper under the circumstances.
(11) The Government took possession of the abutments prior to completion of the project but this partial possession was strictly in accordance with the provision of paragraph SC-1 of the contract. It is my further finding that your field organization was provided with reasonable and adequate working space and area. The working conditions were not intolerable and reasonable, diligent and prudent organization could readily have resolved the situation.
(12) Numerous conferences have been held throughout the life of subject contract and thereafter by both parties or their authorized representatives concerning the matters of dispute both at the project site and at the offices of the Corps of Engineers at Portland, but no agreement has been reached. It is my finding that even if your claim were valid only the cost of excavating, and possibly cost of the tremie concrete, could have been affected by the conditions encountered during the pertinent period of September 13 through November 19, 1954. It is my finding that additional costs could not be claimed on the concrete, cement, and reinforcing steel under the conditions claimed.
(13) It is my further finding that contrary to your claim of additional costs, you actually benefited by the highway bridge contractor’s cofferdam by being able to construct abutment 1 and piers 1, 2 and 3 in the dry with a minimum of expenditures. Luring the pertinent period for extra costs claimed, a great deal of work was performed by your firm on abutment 1 and piers 1, 2 and 3. Also, all of the concrete was placed for abutment 2 during this period. The costs for this work, apart from the excavation, access road, and cofferdam for abutment 2, should not be involved in this claim.
(14) I am unable to reconcile the reasoning, analysis or conclusion on costs you have claimed. If this claim were *94 valid, consideration should be given to beneficial effects of Young & Smith’s cofferdam and a different basis should be used on remaining costs which would recognize only the actual costs of constructing the access road and cofferdam and excavating and dewatering the foundation for abutment 2. In this regard there should also be furnished a complete breakdown as to supervision, direct labor, equipment rental and materials with the understanding that all of such costs would be subject to Government audit. However, in view of the fact that the present basis is not considered valid nor acceptable at all, all such costs claimed must be rejected in their entirety.
(15) It is noted that you have failed to acknowledge the concession made by the Government in allowing you to place abutment 2 concrete under water thus bringing about a cheaper and less satisfactory result than that originally specified in the contract. This allowance benefited you because there was no change in the concrete prices and you benefited from additional cement paid for at your original bid price. Additional time extensions were also granted by the Government, thus relieving you from imposition of liquidated damages.
(16) The records of this office contain no mention of your plan for a cofferdam and I must assume that no plan was submitted before or after it was constructed. Based on the results obtained, it is my conclusion that you had not worked out a well-conceived plan prior to the time of construction. As a further indication of poor organizational set-up, it is noted that you were obliged to use several different supervisors on this contract.
(17)' It is my conclusion that the entire controversy that has developed could have been avoided if you had demonstrated a desire to cooperate willingly and reasonably with the State contractor. It is my finding that the situation existing between the two contract jobs did not compel the Government to request cooperation from the State or its contractor in view of my finding that the State contractor was diligently trying to cooperate with you.
(18) I find that much of the claim costs actually incurred by you resulted from poor engineering and construction *95 practices. Minimum requirements only were being met. For instance, your cofferdam around abutment 2 was constructed poorly and leaked badly, whereas the State contractor bad no difficulty in putting together a tight, well-compacted cofferdam. It is my finding that the conditions encountered were all foreseeable and, in fact, you have acknowledged compliance with paragraph GC-3 and SC-27 of subject contract.
(19) It is my finding that there was in fact no changed conditions encountered by you in the performance of your work.
(20) It is my finding that no extra work was here involved but only that which was originally required under subject contract.
(21) It is noted that you have been dilatory in presenting this claim and that although urged to present a timely claim if there was validity to the same, you delayed for a period of over 18 months after completion of the work involved before presenting the present claim to this office.
The foregoing constitutes my Findings of Fact upon which I have concluded that the work performed by you was in compliance with your contractual obligations and the costs thereof merely an incidental item of expense for your account; that you have in fact not encountered changed conditions nor do I consider the Government has breached its contract with you in any regard. Your claim, therefore, for reimbursement in the amount of $71,675.31 must be and hereby is denied in its entirety.
Your attention is invited to Article 6, “Disputes,” of subject contract in accordance with which you should proceed if it is your desire to appeal from this decision.
If you determine to appeal this decision, inclosed for your information and guidance is a copy of applicable rules promulgated by the Corps of Engineers Claims & Appeals Board governing such matters. If it is your desire to meet and discuss this matter further, a mutually satisfactory time may be arranged.
In the event you determine not to appeal this decision, a letter signifying your withdrawal would be appreciated in order to complete our records in this matter.
*96 APPENDIX D
OPINION AND DECISION OE CORPS OE ENGINEERS CLAIMS AND APPEALS BOARD
Department op the Army Office of the Chief of Engineers Washington 25, D.C.
Before the Corps of Engineers Claims and Appeals Board
Eng C&A Board Decision No. 1188
Appeal of Lee Hoffman Under Contract No. DA-35-026-eng-20846
Appearances for the Government: Clifford C. Comisky, Esquire; Thomas J. Bailen, Esquire.
Appearances for the appellant: Messrs. Mautz, Souther, Spaulding, Denecke & Kinsey. By: John L. Schwabe, Esquire.
OPINION BY LT. COL. R. J. HALL
On 6 January 1953, the U.S. Government, acting through the District Engineer, Corps of Engineers, U.S. Army, Portland, Oregon District, executed a contract with the State of Oregon for highway relocations necessitated by the construction of The Dalles Dam. Included among the relocations thus contracted was the construction of a highway bridge over the mouth of the Deschutes Liver. Railroad relocation necessitated by the same dam construction was accomplished by the District Engineer through direct contracting. The railroad ran generally parallel to the highway and also required a bridge over the mouth of the Deschutes Liver. The two bridges were almost parallel with the railroad bridge downstream and only 68 feet existed between their center lines.
On 19 April 1954, the State of Oregon awarded the Deschutes Liver highway bridge contract to the construction *97 firm of Young and Smith, the low bidders on the work. Lee Hoffman was second low bidder.
The District Engineer advertised the Deschutes River railroad bridge on 6 May 1954. When bids were opened 8 June 1954, Lee Hoffman was found to be low. Young and Smith were among the unsuccessful bidders. Mr. Hoffman was awarded the contract on 17 June 1954.
Meanwhile, Young and Smith had begun work on their highway bridge contract and on 13 June 1954, commenced building a cofferdam from the west bank of the river. (Findings of Fact (4).) Eventually this cofferdam was extended well past the center of the stream and all the flow was thus diverted to the easterly portion of the river. Mr. Thatcher, Young and Smith’s superintendent, in charge of the highway bridge testified (Deposition p. 9) in this connection that originally he intended to construct the cofferdam only out to the location of Pier 6 but because of river current he had to extend it to Pier No. 7 where a natural island provided an adequate terminus. Because of this diversion, the river flowed, with considerable depth and speed over the location of the east abutment of the railroad bridge, which location the drawings show normally would have been practically high and dry.
Mr. Hoffman testified (Tr. p. 35-36) at the hearing that his plan for constructing the highway bridge in the event he had been the low bidder, was to build individual cofferdams for all piers located in the stream and to connect the piers for access purposes by means of a timber bridge supported by temporary wooden rock filled cribs. This method would result in but minor interruption to the stream which would never be diverted from its main channel. He testified (Tr. p. 38) that he planned on utilizing the same method for the construction of the railroad bridge.
Upon learning that Hoffman was the low bidder on the railroad bridge and prior to commencing their cofferdam, Young and Smith, in the person of Mr. Thatcher (Deposition p. 9-10) called Mr. Hoffman on 13 June on the telephone, informed the latter of the planned cofferdam and discussed sharing of the costs thereof since it would furnish protection *98 to the west abutment and certain piers of the bridge to be built by the appellant, rendering unnecessary individual cofferdams for each one. Mr. Hoffman informed Mr. Thatcher (Tr. p. 49-50) that he was not certain of receiving the award and could therefore make no commitment, but would discuss the matter further if Thatcher would hold up the cofferdam. Joint use of equipment was also discussed, as was a meeting on the job site to go over the work and plan operations. Mr. Hoffman stated he had to go to California on business and would get in touch with Thatcher on his return. Mr. Hoffman testified that on his return from California where he had spent about a week procuring a Keadymix concrete plant for use on the project he made three vain attempts to reach Thatcher. Mr. Thatcher, for his part (Deposition p. 11) after waiting a week to ten days without hearing from Mr. Hoffman, began work on the cofferdam.
Appellant’s contract contained the following general provision :
12. OTHER CONTRACTS
The Government may undertake or award other contracts for additional work, and the Contractor shall fully cooperate with such other contractors and Government employees and carefully fit his own work to such additional work as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by anv other contractor or by Government employees.
Among the special conditions was the following:
SC-1. Commencement, Prosecution and Completion. — a. The contractor will be required to commence work under this contract within 15 calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use not later than the dates specified below. The time stated for completion shall include final clean-up of the premises.
(1) The concrete abutments shall be completed not later than October 1,1954.
(2) All other work under this contract shall be completed within 450 calendar days after the date of receipt of notice to proceed.
*99 b.' The completion date given under paragraph SC-la(l) is necessary in order to allow for construction of the abutment fills by another Contractor working in the vicinity of this bridge.
The 1 October date was later changed by appropriate contract modifications to 4 December 1954.
In order to meet the abutment completion date originally specified, the contractor planned to commence operations on abutment 1 which was located in the dry on the west bank outside of the normal flow of the river. (Tr. p. 51). Shortly thereafter (somewhere around 1 August), he would begin operations on abutment 2, the east abutment, (Tr. p. 51 and 57) which he also expected to be in the dry. Easy access to the west bank and abutment was available but clearing and construction of access roads were required before work could commence on the east abutment. (Tr. p. 57).
Because of certain technical delays in connection with the railroad, the completion date for the abutments was extended by Change Order No. 2, dated 8 September 1954, to 15 October 1954.
Work was initiated on 20 July 1954 on the west bank where abutment 1 and three piers were virtually in the dry because of their natural location and/or the effects of Young and Smith’s cofferdam. Work on the east bank, on abutment 2 and adjacent piers was not started because of the stream passing over these locations due to the previously described diversion by the cofferdam.
Hoffman’s superintendent, Mr. Booth, notified the Government Besident Engineer by letter 7 August 1954,
... At the time of bidding the project, conditions at the site indicated that it would be possible to construct abutments 1 and 2 and piers 1,2 and 5 in the dry. Since bidding the project, Young and Smith have constructed a gravel and rock fill out to approximately pier 4 and upstream from the railroad bridge site, thus forcing the river flow in the area of the railroad bridge pier 5 and abutment 2. Because of this fill upstream ... , it is now necessary that we proceed only with the construction of . . . abutment 2 until such time as the water can be diverted back to the original channel through piers 3 and 4.
*100 The effect of this change condition, both on the contract time and cost, is uncertain at this time.' We, therefore, request that a conference be called . . . between representatives of Young and Smith, the State Highway Bridge Department representatives, representatives from this concern and yourself, in order that we may coordinate operations on the two bridge projects. . . .
In his reply the Resident Engineer wrote with respect to a previous conference he had with Mr. Booth, . . Mr. Booth was advised that he should arrange such a conference and that this office would cooperate in every way. Mr. Booth stated he would do so . . .
There is no evidence that the two contractors ever held this mentioned conference to coordinate operations.
On 21 August, Mr. Hoffman wrote,
‡ $ * $ $
Young and Smith fill has forced the flow of the stream to the east bank which will result in our having to construct pier 5 and abutment 2 in the wet. In order to go to work on abutment 2 it is necessary to construct a rock or gravel fill out to abutment 2. This work is necessary at this time in order that we can proceed with the work and meet our completion schedule for abutment 2. . . .
It is anticipated at approximately $1,500.00.
It is anticipated that further difficulty will be encountered with wash from the Young and Smith fill and possible delay in constructing pier 5 and abutment 2. The Young and Smith fill has resulted in a changed condition. Article 4 of the contract would apply in this case as sub-surface and/or latent physical conditions at the site materially differ from those shown on the drawings or indicated in the specifications. . . . The conditions encountered at the present time cannot be deemed a geological freak, but rather a condition which would not be anticipated by the party to the contract in entering into the initial agreement.
❖ ❖ *[»
It is pertinent to note at this point that the appeal now before us is partially based on changed conditions as just described.
With respect to the anticipated conference between the contractors, Mr. Hoffman’s letter stated:
*101 Young and Smith’s attitude, with reference to the fill, is such that we have not been able to arrange such a conference and believe that the only way that such a conference can be arranged is for you to take the necessary action to set up a conference on an official basis. . . .
The contracting officer arranged a conference and on 8 September wrote:
. . . pursuant to your request, representatives of this office met with you and the State highway bridge contractor. We have also made a preliminary investigation at the job site of your complaint and will continue to study the matter during progress of your contract work. However, to date, analysis of this preliminary investigation indicates that no stop order is justified at this time. ... You are therefore directed to proceed with construction ....
If a cofferdam was constructed to include Pier 5, it probably would endanger the highway contractor’s cofferdam, but a cofferdam constructed only to include Abutment 2, which is of primary importance as to the completion date, will not cause failure or endanger the state contractor’s cofferdam.
In reply the contractor on 10 September wrote:
. . . We never, at any time, anticipated that Young and Smith would proceed as they have done. When we figured the same job which they now have, never . . . did we contemplate diverting the entire flow of the river to the east side as they have done. . . .
In our plan of operations when we bid this railroad bridge, we had anticipated cofferdaming in one operation to construct abutment #2 and pier 5.[33] To do this in separate operations will grealy increase our costs. In view of your refusal to give us an extension of time or a stop order in connection with construction of abutment 2 and pier 5, we will immediately proceed with all expedition to construct these structures and we are today writing to Young and Smith advising them of our plan to do this and requesting them to protect themselves. . . .
Replying by letter of 14 September, the contracting officer wrote:
*102 . . . Inasmuch as you were also a bidder on the State Highway bridge and were required to fully investigate conditions pursuant to the problems involved by your contract, you were required to become acquainted with the problems involved and the need for close cooperation between all contractors. Any damages caused by your acts, particularly when such damages could be avoided by cooperation with the State Highway contractor, are your liability. . . .
By telephone on 19 September the contractor advised the contracting officer that his attempt to run a cofferdam from the east bank toward the location of abutment 2 was endangering the Young and Smith operations.
Mr. Hoffman testified (Tr. p. 66 and 108) that it was necessary to construct a rock jetty to break the flow of the river before putting in his cofferdam. This jetty as constructed eventually met the east end of the Young and Smith’s cofferdam, thus temporarily damming the river. However, since Young and Smith’s cofferdam was lower and constructed of less substantial materials, it was being washed out as the Hoffman jetty was elongated.
Mr. Hoffman described the situation by letter on 15 September as follows:
... we knocked a hole in our cofferdam to lower the water temporarily and went and conferred with Young & Smith’s superintendent. It appeared to us at that time that if they would knock a portion of their cofferdam extending back to somewhere between piers 5 and 6 of their job, that sufficient diversion could be effected to permit us to proceed and permit them to proceed with other portions of their work. We could get no coopera-tions, so we again commenced cofferdaming. . . .
Although Young & Smith are constructing this for the State Highway Commission, it is our understanding that they are, in effect, subcontractors and the State of Oregon, through its Highway Department, had a direct contract with you. We believe that under Article 5 of our contract we are entitled to claim an extension of time and protest against the assessment any liquidated damages, j . .
He amplified this argument by letter dated 17 September 1954 in which he quoted an excerpt from Article 3 of the Government contract with the Oregon State Highway Commis *103 sion for tbe highway and bridge relocation. The entire article is as follows:
Ajrholb 3. Ownership and Conduct of the Worh. — a. The facilities constructed hereunder shall be the property of the State. The State shall be responsible for all materials furnished and work performed by it.
h. The Government may award other contracts for additional or other work in connection with the same project or in the same vicinity. The State shall conduct operations so as to cooperate fully with any such work being performed by the Government and/or Government contractors and shall carefully fit its own work to that provided under other contracts as directed by the Contracting Officer. The State shall not commit or permit any act which may interfere with the performance of any such work by the Government and/or any Government contractor.
Mr. Hoffman’s 17 September 1954 letter included the following:
. . . Many times ... we have tried to secure your cooperation in directing the State Highway Department, or its contractor, Young & Smith, to cooperate with us in cutting back their cofferdam ....
Your attitude has always been one of disinterest and you have stated, both to the writer and to his attorney, that you did not intend to interject yourself into any bipartisan quarrel between two contractors. . . .
We received a call from the attorneys for Young & Smith yesterday in which their attorney threatens injunction proceedings against us for proceeding with our cofferdam, which has forced them to tear out a portion of theirs. They also object to us constructing our cofferdam on a portion of their right-of-way on the east side of the river. They, of course, have no use for this particular portion of their right-of-way at the present time.
Young & Smith had completed a large portion of their cofferdam prior to the time we were awarded our job. At that time we protested to them . . . but they assured us . . . that it was only going to their pier 5¿ . . .
It only became apparent to us . . . this week that they had actually gone out as far as pier 7. It was this information that let Mr. Booth to tell you, . . . that our cofferdaming out to abutment 2 would still leave approximately eighty feet of channel between our cofferdam and theirs. It was only after we had placed our cofferdam far enough out in the current to endanger their *104 operations that they finally cut back to the location of pier 6, They advise us that apparently this is not going to give enough water diversion to keep from endangering the rest of their cofferdam. It is our opinion that they should cut back to approximately pier 5 and, if necessary, riprap the end of their cofferdam to prevent further damage and erosion. I cannot but believe that this is a situation well within the jurisdiction of yourself as Contracting Officer and that you should accept your responsibility and give directions that will end this controversy between two contractors ....
Young and Smith eventually did cut back their cofferdam to pier 5. Concerning the difficulties experienced by the appellant with the state contractor, the contracting officer stated his position by letter of 24 September as follows: & $ * * ❖
It is the position of this office that it is incumbent upon you to meet fully the requirements of your contract, to cooperate and coordinate your efforts with the State contractor for your mutual benefit, and to adhere strictly to the completion schedules set forth in your contract, or as they may be modified.
In this connection you are further advised that the State’s operations are not under any direction or authority of this office, nor is there any privity of contract existing between this office and the State contractor.
In snort, it must be considered that any direct damages inflicted upon your work by the activity of the State contractor would be in the nature of a tortious action and beyond any contractual rights controlled by the Government.
# * ❖ ❖ *
The contractor, contending that the contracting officer was responsible for the conduct of the state contractor through the medium of the Government’s contract with the state, requested on 18 October a stop order on the construction of abutment 2 and adjacent piers until such time as the state and its contractor would have removed a sufficient portion of their cofferdam to permit adequate water diversion. In the same letter he wrote “Your failure to require the necessary cooperation by the state and its contractor has delayed my operations and I am now formally requesting an extension of time of one hundred and twenty days in the performance of my contract.”
*105 After initially refusing to extend the time for completion or issue a stop order the contracting officer, after conferring with Mr. Hoifman on 26 November 1954, reconsidered and on 29 November issued contract modification No. 5 which extended the completion date for abutments to 4 December 1954. The modification was accepted under protest by the contractor. Since the work on both abutments was completed on 4 December 1954, and all principal contract work completed on 30 April 1955, with the completed job being accepted on 13 July 1955, no liquidated damages accrued.
On 6 June 1956 the contractor formally submitted a claim for damages in the amount of $71,675.31 which were incurred during the period of 11 September 1954, to 20 November 1954. The claim alleged that the damages resulted from changed conditions and from the Government’s breach of contract.
The Government also invited attention to what it termed dilatoriness exhibited by the contractor in submitting his claim. In this respect it pointed out that all principal work was completed on 30 April 1955, the job was finally accepted on 13 July 1955 and that the claim letter of 7 June 1956 is in excess of 18 months from the end of the claim period on 20 November 1954, despite Government exhortations to the contractor to submit the formal claim at an early date if he felt he had a claim, and that this period of time is detrimental to the Government’s interests.
Additional correspondence between the parties is in evidence but the foregoing excerpts are sufficient to adequately delineate the difficulties experienced by the appellant and the positions taken by the principals.
As a result of the damage to their cofferdam, Young and Smith resorted to court action and effected some measure of recovery from the appellant herein, who sought to amend the amount of his claim accordingly. He submitted a revised claim long after the contracting officer’s decision and approximately one week before the hearing on the appeal.
DECISION
The jurisdiction of this Board is appellate in nature and does not extend to claims as such which have never been *106 decided by the contracting officer. Since the amended claim was submitted to the contracting officer shortly before the hearing on the original claim, and since he was unable to render a supplemental decision within the short time remaining, it follows that no appeal therefrom could be made. Before us at this time is the appeal from the contracting officer’s decision on the original claim amounting to $71,675.31.
Our jurisdiction is derived from the disputes clause of the contract and extends to matters arising within the framework of the contract. A breach of contract by its very nature is a matter outside of the contract and thus, one beyond the remedial scope of the Board.
Of vital concern then is the remaining allegation of changed conditions.
Undoubtedly, the appellant when he submitted his bid did so without giving any consideration to a possible diversion of the main stream from its channel to the location of the east abutment. This diversion was not mentioned in the contract documents. When he encountered this condition on the job he felt it to be a changed condition under the terms of the contract. It was not a subsurface or latent physical condition at the site differing from those indicated in the contract. It was instead a strictly man-made condition caused by the operations of another independent contractor, and dependent upon his discretion and judgment. Appellant’s contract included the information that other contractors would be working on the site and required cooperation between them. There was nothing unusual under these circumstances with respect to river diversion. It was to be expected. In order to accomplish the desired construction on both contracts, either diversion or some other method of river control was mandatory. The method was properly left to the successful bidders. The diversion as accomplished was not an unknown physical condition at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
Both contracts enjoined mutual cooperation. Such cooperation is to be expected on any project and of necessity is *107 an inherent ingredient of the construction industry. From the very outset of this project it was not achieved between two contractors, each of whom had bid on both contracts and were fully conversant with its extreme importance. The contracting officer is not designated by the contract as the arbiter and quite properly refused to take sides in the matter. When it was made evident to him that the scheduled completion of the abutments could not be timely accomplished because of interference he granted an extension.
In consideration of the foregoing the appeal is Denied.
Date: 23 May 1958.
B. J. Hall,
Lt Col, CE, Member of the Board.
I Concur: Harold F. Blasky, Member of the Board.
I Concur: JoiiN P. Campbell, Member of the Board.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover an equitable adjustment for increased costs from Changed Conditions as prescribed in his contract with the Government, with the amount of recovery to be determined pursuant to Buie No. 47(c) (2). Judgment is entered accordingly.

Trial Commissioner Herbert N. Maletz, at tbe direction of the court, prepared recommended ultimate findings in this case, which were of substantial assistance.

 Tlie two bridges were separated by a distance of about 68 feet from their centerlines. (Fdg. 6(a)).

 Finding 10 — “between tbe proposed location of Piers 3 and 4.”

 That article captioned Changed Conditions reads:
“The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shaU be determined as provided in Clause 6 hereof.”

 The Deschutes River flows from south to north. It is a tributary of, and enters the Columbia River about 12 miles above The Dalles.

 In this Report, the term “hents” refers to the supports of the highway bridge; the term “abutments” refers to the end supports of the railroad bridge ! the term “piers" refers to the intermediate supports of the railroad bridge.

 Apparently plaintiff also suggested that Mr. Thatcher “come down and talk to Booth [plaintiff’s general superintendent]” to which Mr. Thatcher replied, “it’s no use talking to him there. Let’s meet up on the job.”

 At this pre-award conference, which was held a day or two after the opening of bids, plaintiff was advised by the defendant’s representatives that he would probably get the contract.

 Both the plaintiff and the contracting officer stated in written communications that construction of the Young & Smith cofferdam was started on June 13. See, e.g. findings 20 (f) and (g). Mr. Thatcher, however, placed the starting date at June 22. In light of this testimony and the sequence of other events, the logical inference is that construction was started on or about June 22. On the other hand, if the earlier date is correct, this would mean that construction of the Young & Smith cofferdam was started before plaintiff was awarded the railroad bridge contract.

 As previously noted, plaintiff was awarded the railroad bridge contract on June 17, 1954, and received notice to proceed on July 6, 1954. See findings 5(c) and 5(f).

 See finding 7(b).

 The Board stated that the contract drawings showed that the location of Abntment 2 “normally would have been practically high and dry.”

 The Mr. Clayton referred to in finding 14, visited the completed railroad bridge in mid-January 1956 and estimated that at that time, there was at least a foot of water on one corner of Abutment 2 and possibly more on another corner. In his opinion, this amount of water would not constitute a major problem.

 As stated in finding 5(g), the completion date of the abutments was extended from October 1 to October 15, 1954. This was accomplished by Modification No. 2, dated September 8,195'4. ' - . .

 From July 7 to July 29, the plaintiff was engaged in mobilizing equipment, building offices, shops and batch plant; and surveying for work lay-out.

 At this time Young & Smith was working on Bents 5 and 6.

 Young & Smith’s contract provided that the end bents were to be sufficiently completed to enable the grading contractor to place the fill by September 1, 1954. See finding 4(d). However, even before Young & Smith started its cofferdam, the State granted an extension for completion of Bent 9.

 On the same date as this letter, Modification No. 2 was issued extending the abutment completion date to October 15, 1954. See finding 5(g) and footnote 11.

 See footnote 6.

 As described in finding' 5(d), it was necessary that the abutments be completed on the specified date in order to allow for construction of the abutment fills by another contractor working in the vicinity of the bridge. The contractor so referred to was Gibbons & Reed, which also had a contract with the State of Oregon for construction of the end bent fills for the highway bridge.

 The statement contained in this letter that plaintiff anticipated coffer-damming Abutment 2 and Pier 5 in one operation is in conflict with his testimony before the Board that he planned individual cofferdamming for the railroad bridge. This discrepancy was noted in the Board’s decision.

 Plaintiff’s letter was incorrect in stating that the Corps of Engineers had advised that Pier 5 had to be completed by October 1. The Corps of Engineers’ letter of September 8 to the plaintiff stressed the importance of completing the abutments by that date, not the piers. See finding 20 (f).

 Plaintiff’s cofferdam, was constructed on a portion of Young & Smith’s right-of-way on the east side of the river. When advised of this, the Resident Engineer directed plaintiff’s attention to the contract drawings showing that all construction activities, including the construction of temporary cofferdams, must be confined to the railroad right-of-way. Plaintiff responded that he would not have had to use Young & Smith’s right-of-way but for its diversion of the entire river to that area. Plaintiff was again advised, this time by the contracting officer, that the Government had no right to the use of the highway right-of-way and that his use of land outside the limits shown' on his contract must be at his expense and subject to the agreement with the State highway bridge contractor, Young & Smith.

 As hereinafter set forth, Young & Smith filed suit against the present plaintiff in the U.S. District Court, District of Oregon, for damages of $17,324 to its cofferdam. The present plaintiff filed an answer and counterclaim. Also as hereinafter set forth, the suit was ultimately dismissed without either party mating any payment to the other.

 A few days before this, the contracting officer granted the plaintiff permission to place Abutment 2 concrete under water, though in accordance with standard practice, he required plaintiff to increase its cement content.

 Plaintiff formally withdrew his appeal on December 0 without waiying any claim for increased costs.

 See also finding 5(g).

 The Division Engineer of the Corps of Engineers advised the plaintiff by letter dated November 25, 1954, that “As a result of the late completion of the east abutment [Gibbons & Reed] the contractor holding the contract for the abutment fills is claiming a breach of contract on the part of the Government. . . .” The administrative record does not reflect what disposition was made of this claim.

 The contracting officer referred to the period from September 13 to November 29, 1954 as the pertinent period of the claim. In fact, the claim was for the period beginning September 11, 1954, -which is the approximate day when plaintiff started construction of the rock jetty. See findings 22 and 27, ««pro.

 The Disputes article here, approved for use before the Wunderlich Act (1954), does not contain the “substantial evidence” phraseology thereafter incorporated into most dispute provisions.

 Further facts with respect to this additional item are hereinafter set forth.

 Plaintiff in his petition before this Court fails to allege that the Board decision is not supported by substantial evidence. The defect in pleading is one of form rather than of substance.

 It Is also worthy of note that the contracting officer, in allowing a 5<Eday extension, had determined that the action of Young & Smith in constructing its cofferdam had caused plaintiff delay in completing the east abutment and that this delay was “due to causes beyond (plaintiff’s) control and without (his) fault or negligence . . .” See finding 25(d), supra.

 No explanation was given regarding the discrepancy between this statement and Mr. Hoffman’s evidence (Tr. p. 35 and 36) that he originally planned to utilize individual cofferdams connected by a timber bridge.